# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON

Assigned on Briefs February 14, 2012

## STATE OF TENNESSEE v. RODNEY WATKINS

**Appeal from the Criminal Court for Shelby County**
**No. 09-07892   Lee V. Coffee, Judge**

---

**No. W2010-02570-CCA-R3-CD  - Filed February 13, 2013**

---

The Defendant, Rodney Watkins, appeals from his conviction by a Shelby County Criminal Court jury of second degree murder, a Class A felony. See T.C.A. § 39-13-210 (2010). The Defendant is serving a twenty-five-year sentence as a violent offender. On appeal, he contends that (1) the evidence is insufficient to support his conviction, (2) the trial court erred in admitting evidence about rumors regarding the victim's disappearance, and (3) the trial court erred in ruling that the defense could not cross-examine a witness about the witness's prior assault of his stepfather. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

James E. Thomas (on appeal), Juni Samrat Ganguli (at trial), and Janele Oleaga (at trial), Memphis, Tennessee, for the appellant, Rodney Watkins.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stephanie Zander Johnson and Kate Provencio Edmands, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's conviction results from the death of Lamika Turner. At the trial, Debra Williams testified that the twenty-year-old victim was her niece. Ms. Williams said her sister was the victim's mother. She said she became aware that the victim was missing on February 3, 2009.

Memphis Police Investigator Vertie McNiel testified that the investigation into the victim's disappearance began on February 5, 2009, when Officer Neddles spoke with Joyce Turner, the victim's mother. Investigator McNiel spoke with Ms. Turner on February 6. She said Ms. Turner identified the Defendant by name and by his nickname, Hot Rod. She said the victim was supposed to have gone to the Defendant's home. Flyers with the victim's photograph and information were prepared. She said that on February 7, she called the Defendant at a telephone number Ms. Turner provided. The Defendant identified himself as the victim's "play uncle." The Defendant said that he last saw the victim when he walked down the street with her and that she got into a car with a man called "Keevin." The Defendant claimed he overheard Keevin say, "B----, get your punk a-- in this car." The Defendant said that the victim refused and that Keevin held up a bag of cocaine. The Defendant reported that the victim said, "I will see you later. I'm going to see what he want [sic]."

Investigator McNiel testified that she spoke with the Defendant again on February 10, 2009. She showed the Defendant a photograph array, from which the Defendant identified Kevin Lee Harris as the person he knew as Keevin. On April 4, the Defendant told Investigator Watkins that he had not seen the victim but that Brandon Bailey told him that others said they had. Investigator McNiel said the Defendant stated that he had seen Mr. Harris driving around the neighborhood and had called the police in order for them to talk to Mr. Harris about the victim. Investigator McNiel said a contact letter was sent to Mr. Harris. She said that officers went to Mr. Harris's address but that he was never home. She called the victim's cell phone twice but there was no answer. She checked to see if the victim was in jail. Sergeant Parks advised her on May 9, 2009, that a body had been found the previous day. When Sergeant Parks told her on May 19 that the body had been identified as the victim's, Investigator McNiel closed her investigation.

On cross-examination, Investigator McNiel testified that although she learned on February 10, 2009, that the Defendant's name was Rodney Watkins, she continued to refer to him as Rodney Watson in her notes. She said that after about two months of attempting to contact Mr. Harris, she sent the letter on April 5, 2009. She said she eventually asked another department to assist her. She said that her notation that Debra Williams was arrogant was a mistake. She identified the flyer she prepared regarding the victim.

Dr. Edward Turner, an expert in forensic odontology, testified that he consulted with the Shelby County Medical Examiner's Office in May 2009 in case number 2009-0487. He compared the teeth on a body to the victim's dental x-rays and determined that the body was the victim's. He said that three teeth were missing. He said that teeth sometimes fell out as a body decomposed. He did not see evidence of trauma to the victim's mouth.

Memphis Police Sergeant Joseph Benya testified that he went to a house on Cella Street on May 8, 2009, after learning a body was found there. He said that when he arrived, the house had been secured. He said the felony response officers held the scene until homicide detectives arrived. He said the felony response officers provided support for the homicide officers.

Sergeant Benya testified that he talked to the Defendant at a house just north of the scene on May 8. He said that he asked the Defendant about activity at 1517 Cella Street and that the Defendant mentioned "Nicka," who had been missing, and said he had already talked to the police about her. Sergeant Benya said the Defendant claimed he began noticing a smell about three days earlier. Sergeant Benya said the smell was noticeable from the street. He said that to his knowledge, the Defendant was not the person who called the police. He said that the smell was strong at the Defendant's house. He said the house where the victim's body was found was visible from the Defendant's kitchen window. He said there were large black flies around the house with the body and that some were near the Defendant's house. He said the Defendant stated that someone named Kevin was evicted in April from the house where the body was found. The Defendant denied going into the house to check on the smell and said he never went into the house.

On cross-examination, Sergeant Benya testified that the Defendant probably knew from a patrolman that there was a body inside the house. He said the Defendant mentioned the victim as a missing person who frequented the area. He acknowledged that his report did not say anything about his going into the Defendant's home. He said he was at the scene for two to four hours that day. He said he spoke with Janet Pierce briefly but did not recall if he spoke with Brandon Bailey.

Numerous photograph exhibits, a map, and a diagram were received by stipulation. The photographs and diagram depicted the scene at 1517 Cella Street. The map provided an aerial depiction of the neighborhood.

Memphis Police Officer Eric Carlisle testified that on May 8, 2009, he went to 1517 Cella Street to process a crime scene. When he arrived, other officers were present, and the house had been taped off. He took photographs and collected evidence. He said he worked with Sergeant Tony Mullins at the scene.

Officer Carlisle testified about the scene using the photographs. He said the northeast bedroom contained cinder blocks. He said the victim was found in the northwest bedroom. He said there were pieces of a cinder block in the corner of the northwest bedroom. He said there was a large amount of maggot larvae in the house. A shower curtain covered the bedroom window, and blood spatter was on the walls. He said the victim's panties were on

the floor. A baseball cap, an empty Magnum condom wrapper, and a pair of jeans were on the floor. He said two mattresses were on top of the victim's body. He said his partner, T.J. Ellis, sketched the scene. He said cinder block pieces were near the victim's head. He identified a piece of cinder block he collected that had been at the victim's head. He said that the cinder block piece appeared to have blood and black hairs on it when he collected it. He said that he recovered a small purse but that it did not contain the victim's identification. He said the scene was unique for the level of decomposition of the body and its strong odor, which he said was noticeable outside.

On cross-examination, Officer Carlisle testified that an exterior door facing the driveway had pry-mark damage. He said the damage would have been caused by someone trying to get inside. He said the interior door to the northwest bedroom was damaged and had been forced open from outside the room. He said a red and white hat was a few feet from the victim's foot. The hat had maggot larvae on it. He said the condom wrapper was about six feet from the body. He agreed that the scene was the only one he had ever worked that involved the victim's head being bashed in with a cinder block.

On redirect examination, Officer Carlisle testified that one of the jeans legs was inside-out and that a pink or red and white shoe was inside. He said the matching shoe was on the floor near some furniture. He said the house was in disarray and appeared to have been abandoned for some time. He did not know how the officers who first responded to the scene gained entry into the house. He said the victim's body was not visible until the mattresses were moved. He said the victim wore only a t-shirt.

Memphis Police Sergeant Anthony Mullins, an expert in blood stain analysis, testified that he responded to 1517 Cella Street in May 2009. He said the residence was a duplex that had been converted into a single dwelling and used "almost like a rooming house." He said that one of the front doors was boarded. He said that tenants' personal effects had been left behind but that the house had been vacant for some time. He said it was evident that people had been coming in and out of the house. He said that there were dead and live flies in the house and that there was a strong odor. He noted maggot casings on the floor in the room where the body was found.

Sergeant Mullins testified that based upon the blood spatter pattern, it was possible to determine the number of blows, usually within two, that a victim received. He said that examination of a crime scene, rather than examination of photographs, provided better results. He said he viewed the blood stains at the scene and directed that photographs be taken.

Sergeant Mullins testified that the victim was face-down under the mattresses. Her arms were almost underneath her body, and her legs were spread. She wore a sweatshirt, and a sofa pillow was on top of her. He said a shoe was inside the inside-out leg of a pair of jeans. Based upon the way the victim's clothing was removed, he thought it was likely she had been sexually assaulted. Based upon the blood stains on the walls, he thought there was also a high probability of a blunt-force assault.

Sergeant Mullins testified that there typically was not castoff of blood from the first blow to a victim. He said that there would be blood present by the time a second blow was inflicted and that there would be castoff as the weapon was retracted. He said there might also be impact spatter from the force of a blow hitting the body. He said the patterns were different for castoff and impact spatter. He said that dripped blood stains created a different pattern from either castoff or impact spatter.

Using photographs taken at the scene, Sergeant Mullins testified about blood spatter on the walls in the bedroom where the victim's body was found and the directional travel of the stains. He said the spatter demonstrated low velocity blunt force trauma with the victim on the ground by the time the second blow was administered. He identified a pattern that he said could indicate a third blow of medium to low velocity. He identified other castoff patterns. He said there was also blood spatter on the piece of cinder block, indicating the stain was deposited when the piece was used as a weapon, rather than from absorption over time at the scene. He said that other pieces of concrete that were to the victim's side appeared to contain body fluid absorption. He noted that the highest blood spatter was around the height of a wall socket. He estimated that the victim received at least four blows. He did not think the blood spatter patterns could have resulted from the piece of cinder block having been dropped.

Sergeant Mullins testified that he saw evidence of possible blunt trauma to the victim's head but no other injuries. He said the victim's head appeared to have been rotated about ninety degrees from the position that corresponded with some of the blood spatter. He said he suspected that the piece of cinder block was the murder weapon. He noted that the victim's head was almost touching a piece of cinder block. He said there was a broken window in the bedroom that would have allowed odor to escape. In his opinion, the mattresses were placed on top of the victim after she was assaulted. He said the spatter on the walls indicated a blow that could not have happened with the victim underneath the mattresses. He said the victim was not in a position to have pulled the mattresses over her body.

Sergeant Mullins testified that two windows were in the room. One was covered with a sheet or blanket, and the other was covered with newspaper and may have had drapes or

blinds. On cross-examination, Sergeant Mullins stated that he spoke with Kevin Norvell on May 16, 2009. He said he obtained a DNA sample from Mr. Norvell.

Floyd Jackson testified that he lived at 2652 Cella Street. He identified the Defendant as "Hot Rod," who lived in his neighborhood. He said his house was seven or eight blocks from the Defendant's house. He said he knew the victim through the father of her child, Brandon Bailey. He said he gave the victim a ride a couple of times at Mr. Bailey's request. He said that he knew "Keevin" Harris from the neighborhood and that they played video games together. He said he saw Mr. Harris "just about every morning, every night."

Mr. Jackson recalled Mr. Bailey's asking him if he had seen the victim a couple of days after he gave her a ride from her mother's house to the Defendant's house. He said he had seen her with her sister "Tae Tae" at Mr. Harris's house earlier that day. He said there were a few other people there, including Mr. Harris. He said that he went to a casino in Tunica and that while he was there, the victim called to ask him to give her a ride when he returned. He said that when he returned from Tunica, he picked up the victim at her mother's house about 6:00 a.m. and took her to the Defendant's house. He said he saw the victim go inside the Defendant's house and saw the Defendant at the door.

On cross-examination, Mr. Jackson testified that he thought the last time he saw the victim was around April 2009. He said that he had known Mr. Harris for about ten years and that Mr. Harris was a drug dealer. He denied buying drugs from Mr. Harris but acknowledged he probably told police officers in May 2009 that he bought crack cocaine from Mr. Harris. He agreed he told the officers the truth. He said he smoked drugs about once a month and denied that it affected his memory. On redirect examination, he agreed that he told the police in May 2009 that the victim's sister and Mr. Bailey called and asked if he had seen the victim, that he asked the Defendant if he had seen the victim, and that the Defendant acted "funny" and was standoffish. He identified Sunshine as the Defendant's girlfriend. On recross-examination, he said he probably used drugs a couple of days before giving his May 2009 statement.

Kevin Harris testified that he was presently in jail for a drug charge. He said that the case was unrelated to the victim's homicide and that he had not received any promises or offers from the State for his testimony. He said the victim was like a little sister to him. He identified the Defendant in court and by the nickname "Hot Rod." He said he and the Defendant went to junior high and high school together. He said that in February 2009, he lived at 1400 Cella Street and that the Defendant lived at 1515 Cella Street. He did not know who lived at 1517 Cella Street.

Mr. Harris testified that he sold drugs. He said that the Defendant used to watch the door and collect money from people who came to Mr. Harris's house and that the Defendant bought crack cocaine from him. He said that when a person came to the door, he or she gave money to the Defendant, the Defendant brought the money to him and exchanged it for drugs, and the Defendant returned to the door with the drugs for the customer. He said he and the Defendant had a disagreement after he noticed something missing in his house. He said he told the Defendant to leave. He did not recall how long before the victim's disappearance this occurred.

Mr. Harris testified that the victim bought powder cocaine from him every other night. He allowed her to stay at his house to use the drugs. He said that they were close friends and that they confided in each other. He said he did not trust his other customers to come inside. He said he knew the victim for one to one and one-half years. He said she made money from prostitution with people who came to his house. He agreed that he offered his customers drugs and women. He said he did not take a portion of the money the victim made. He said he knew she would spend the money on his drugs. He said she also had customers she met outside his house. He said the victim was easygoing and did not cause problems.

Mr. Harris testified that the Defendant and the victim were interested in one another. He said the victim had sex with the Defendant for money. He said that before he had the disagreement with the Defendant, he never saw the Defendant and the victim have a disagreement. He said the Defendant had a girlfriend, Sunshine. He said that when he went to the Defendant's house, the victim and Sunshine were there together.

Mr. Harris testified that he knew Kevin Norvell as "Black Kevin." He said Mr. Norvell bought crack cocaine from him. He said they had words when Mr. Norvell brought another person to his house. He said this was before the victim's disappearance. He said Mr. Norvell did not stay at his house longer than it took to buy drugs. He identified "Trina" as Mr. Norvell's former girlfriend and said he sometimes delivered drugs to their house.

Mr. Harris testified that he slept during the day and sold drugs at night. He said that on the last night the victim was seen alive, his "play sister" Chris Goodman, his partner David Sampson, the victim's sister, and Floyd "Butch" Jackson were at his house. He said Ms. Goodman was working the door that night. He said the victim and her sister arrived about 8:00 or 9:00 p.m. He said this was the first time he met the victim's sister. He said that he and Mr. Jackson were playing video games and using drugs. He said that he made everyone leave at sunrise and that the victim and her sister left with Mr. Jackson. He said Mr. Jackson returned later and said he took the women to their house but that the victim asked him to take her to the Defendant's house. He agreed that the last time Mr. Jackson saw the victim alive was when Mr. Jackson left her at the Defendant's house.

Mr. Harris testified that the victim's sister called him about three days later and asked about the victim's whereabouts. He said he told her that Mr. Jackson had taken the victim to the Defendant's house. He said the victim's sister also called Mr. Jackson, who told her the same thing. He said he had not heard from the victim after the last night she was at his house. He said the victim's brother came to his house to inquire about the victim. He stated that the police came to his house when he was not home and that he went to the police department to talk to them. He said that he heard rumors on the street about the Defendant claiming that Mr. Harris was the last person who was with the victim but that this was not true. He said that he saw the Defendant riding his bicycle, that he stopped his car and confronted the Defendant, that the Defendant denied saying anything, and that he punched the Defendant and knocked the Defendant from the bike. He said the Defendant told him to stay until the Defendant returned and rode away. He thought the Defendant was going to get a gun. He stayed two or three hours, but the Defendant never returned. He said the confrontation took place about one week before he talked to the police. He denied receiving a letter from the police.

Mr. Harris testified that he went voluntarily to the police department and gave a statement in order to clear his name. He said women were afraid to "hook up" with him or buy drugs from him because of the Defendant's statements. He said he was mad at the Defendant for lying about him. He said he was honest with the police. He said he provided a DNA sample.

Mr. Harris testified that the Defendant also accused "Benzo" of killing the victim. He said that Benzo's first name was Corey and that he did not remember his last name. He agreed that he gave the attorney general's office names and telephone numbers and that he unsuccessfully made calls trying to find Benzo. He said Benzo and Kevin Norvell were not at his house on the last night the victim was there. He denied that he, Benzo, and Mr. Norvell ever went to 1517 Cella Street together.

On cross-examination, Mr. Harris testified that he had used the aliases Kelvin Harris and Keevin Harris. He agreed that these names were lies and said his legal name was Kevin Harris. He denied using the names LaKeevin Shawn or LaKeevin Shaw. He admitted his prior convictions for sexual battery, aggravated burglary, and three counts of possessing a controlled substance with the intent to manufacture, sell, or deliver. He admitted he had two pending drug charges.

Mr. Harris testified that he sold drugs to the victim for about six or seven months. He said he began allowing the victim to conduct prostitution from his home within a month of her buying drugs from him. He said there were three or four other women who conducted prostitution from his home. He said that he did not receive anything for allowing the

-8-

prostitutes to use his home but that he knew they would buy drugs from him. He said two people worked for him at the door. Another person cleaned his house after the drug users and prostitutes left. He said he ran his business from about 10:30 or 11:00 p.m. until about 7:00 a.m. He said he made about $700 to $800 a night. He said his business was open every night. He said he sold powder cocaine, crack cocaine, and marijuana. He said he possessed codeine for his personal use.

Mr. Harris testified that it was common knowledge that the victim was an addict and a prostitute. He said the last time he saw the victim was two or three days before the Super Bowl. He said he had been "drinking syrup," or codeine, and smoking marijuana all night. He said that he was calm and did not have memory problems when he smoked marijuana.

Mr. Harris testified that his disagreement with Kevin Norvell occurred before the victim's disappearance. He said he continued to sell drugs to Mr. Norvell occasionally, when Mr. Norvell came to his house or Mr. Norvell sent someone there to buy the drugs. He denied raising his voice at Mr. Norvell when Mr. Norvell brought another person to his house. He said that he would be mad at an employee who stole money but that he forgave quickly. He said a person with whom he was angry would "be back around" him within two or three days. He said he would not be mad if a prostitute used his home for a sexual encounter with a client but did not spend money with him. He said that he would tell the person to get out of his house and that he would not "mess with" her anymore.

Mr. Harris admitted he knew in February 2009 that police officers wanted to talk to him but acknowledged he did not talk to them until May 10, 2009. He said that he and "Butch" Jackson rode to the police department together but that they did not talk about anything on the way. He said he knew from his neighbors that the police wanted to talk to him about the victim's disappearance and asked Mr. Jackson to take him to the police department. He said Mr. Jackson drove people in the neighborhood "like a taxi cab." He said that after the police talked to him, they interviewed Mr. Jackson.

On redirect examination, Mr. Harris testified that "Keevin" was a nickname, not a lie. He said that he had a car and that his mother owned the house he lived in. He said that he spent the money he made from selling drugs on clothing and shoes for himself and his daughter and that he purchased more drugs to sell. He stated that Kevin Norvell was a customer, not a friend with whom he spent time. He said that he and the victim never had any disagreements over anything stolen from his house, money, or drugs. He said he never had problems with the other women who used his house for prostitution. He said he did not go to the police when he knew they were looking for him because he hoped the situation would go away. He said he missed the police when they came to his home several times. He said that all he said to Mr. Jackson on the way to the police department was that he wanted

to clear his name because the police were constantly coming to his house. He said he was not involved with the victim's death. He said he did not know that Mr. Jackson would be interviewed. On recross-examination, Mr. Harris stated that when the officers came to his house, sometimes he was away and other times he was asleep. He said he learned from his neighbors that the police had been there.

Debra Pinson testified that Kevin Norvell was her boyfriend. She said they lived in a rooming house at 1517 Cella Street from approximately November 2008 to January 2009. She said she rented the room from Ed Ship and stayed until she received her income tax refund. She knew of three bedrooms and thought there was a fourth. She said there was an area of the home that was always closed off. She said Mr. Ship smoked crack cocaine and had "a lot of crack friends going in and out." When shown a photograph of the room where the victim was found, she identified it as the room she rented. She said the room's door was broken from the top hinges when she left. She said the mattress and box springs were stacked on concrete blocks. She said the door she used at the side of the house was broken when she lived there but was unsure if it was in the same condition as depicted in a photograph exhibit. She identified a hat in a photograph exhibit as belonging to Mr. Norvell. She said that she and Mr. Novell never used condoms.

Ms. Pinson testified that she did not know the victim. She knew the Defendant as "Hot Rod" and said he lived next door to 1517 Cella Street. She said she never had any interaction with the Defendant but knew he and Mr. Novell used drugs together at the Defendant's house. She said that in late 2008 and early 2009, the Defendant and Mr. Norvell used drugs together daily or every other day. She said Mr. Norvell had smoked crack for the four years she had been with him. She said she never heard that the victim was missing. She said she saw a lot of people coming and going at the Defendant's house.

Ms. Pinson testified that she did not know when the Defendant and Mr. Norvell stopped hanging out together but that she thought it was around the time she and Mr. Norvell moved in late January 2009. She noticed that Mr. Norvell stopped going to the Defendant's house and went to a different house to use drugs. She said that Mr. Norvell never mentioned why he was not spending time with the Defendant and that she did not question him. She said that Mr. Ship left 1517 Cella Street one day for work and never returned. She said this was the Friday before or after Christmas. She said Mr. Ship said that the house's mortgage would be foreclosed around the first of the year. She stated that Mr. Ship was involved with prostitutes and smoked crack cocaine and that she did not feel safe after he left. She had no personal knowledge of Mr. Norvell going to 1517 Cella Street after she left. She said Mr. Novell was going to return to get one of Mr. Ship's televisions but did not know whether he did so.

-10-

Kevin Norvell testified that he had two jobs in January and February 2009, one with a concrete company and one with the City of Memphis. He identified a photograph of his red and white hat with the logo of the concrete company with which he worked. He said he and Debra Pinson lived in a rooming house on Cella Street in January 2009. He said they moved there after he lost his job with the concrete company. He did not recall the address and said he had lived in three locations on Cella Street. He said one of them was the duplex next door to the house where the victim's body was found. He said the Defendant's duplex was "two doors down." He identified a photograph exhibit as depicting the house on Cella Street where he lived in January 2009.

Mr. Norvell said he knew "Ed" because they used drugs together. He said he paid Ed fifty or sixty dollars a week to rent a room. He thought he and Ms. Pinson moved into Ed's house in November 2008 and left in January 2009. He said that when they left, Ed had disappeared and was not collecting rent. He said that he did not know where Ed went and that drug dealers were looking for Ed. He said the drug dealers "[t]alked real crazy" but did not explain what they said. He said one of the drug dealers was "6-9." He thought Ed left around the second week of December. He recalled bringing leftover Thanksgiving food to Ed. Mr. Norvell said his nicknames were Kenneth and Black Kevin.

Mr. Novell testified that he and Ms. Pinson lived in a back bedroom of Ed's house. He said there was another bedroom on the other back corner. He said that a storm door on the side of the house near the driveway had an inside string that was wrapped around a nail to prevent the door from being opened. He first said he did not recall if the door was damaged, but when shown a photograph exhibit depicting a damaged door, he acknowledged that the door was damaged. He said that at some point, he gave the keys to Ed's house to the Defendant to return to Ed if the Defendant saw him.

Mr. Norvell testified that he had known the Defendant for five or six years. He said he smoked crack cocaine with the Defendant and purchased it from him. He said that he went to the Defendant's house to smoke crack cocaine but that the Defendant did not come to his house to smoke crack cocaine. He said Ms. Pinson did not allow him to associate with drug addicts. He said that he and Ed sometimes smoked in the far corner of Ed's house away from Ms. Pinson. He said he used crack cocaine every day at that time. He said he bought drugs from various people in the neighborhood, including the Defendant and "Keevin." He said it took about three minutes to walk from Ed's house to Keevin's house. He said he had known Keevin for about ten years. He said that Keevin quit selling drugs to him after he took a third man to Keevin's house to buy drugs but the man did not have enough money. He said that Keevin spoke loudly to him when this happened but denied that Keevin hit him or the third man. He said he tried to buy from Keevin again but that Keevin insisted he was not "fooling with" him again.

-11-

Mr. Norvell testified that there was a bed on cinder blocks in his bedroom at Ed's house. He said that it did not have a headboard and that it was stable. He stated that the top hinge of the bedroom door was broken and that the door had to be lifted in order to close it. He said the foot of the bed faced the closet, which was at the corner of the house. He said there were two windows covered by curtains or sheets. He identified in a photograph exhibit the mattress that was in the room when he lived there. He said the photograph depicted an additional mattress and was unsure whether it was in the room when he lived there. He said that one of the windows faced the side of the Defendant's house. He said there was a broken window with papers stuffed in it in the room when he lived there.

Mr. Novell testified that he and Ms. Pinson never used condoms. He denied that a gold condom wrapper depicted in a photograph exhibit belonged to him or Ms. Pinson.

Mr. Norvell testified that he moved in January 2009 to an address that was a ten-to-fifteen minute walk from 1517 Cella Street. He said he did not have a reason to return to Cella Street after he moved because he associated with different people and could obtain drugs in his new neighborhood.

Mr. Norvell denied that he and the Defendant did anything other than smoke crack cocaine and drink alcohol together. He stated that he knew "Sunshine," whom he identified as the Defendant's girlfriend, and that she lived with the Defendant. He estimated that the Defendant lived next door to 1517 Cella Street for two or three months. He said he knew some of the Defendant's associates. When shown a photograph of the victim, he said he did not know her. He said a prostitute, "Skittles," used drugs with him at the Defendant's house. He said that she disappeared for a while and that when he saw her later, she told him she had been in a rehabilitation program. He said she was a "red girl," which meant she was light-skinned.

Mr. Norvell testified that homicide detectives came to talk to him and Ms. Pinson as he was preparing for work at Memphis in May. They went to the police department and were questioned about the room they lived in on Cella Street and the victim's case. He said that at first, he thought the police were talking about a crime involving Skittles because she and Sunshine were the only "red girls" he knew. He said he had not heard about a missing woman in the neighborhood. He agreed that he gave two statements to the police and that he did not tell them much in the first.

Mr. Norvell testified that he told the police he did not know Lamika Turner but that if this person were Skittles, he knew her from using drugs with her. He said he told the police that he had seen Skittles at Keevin's house. He said that Skittles was missing some teeth one day and that she said her boyfriend knocked them out. He said he never met

Skittles's boyfriend.  He said he was not truthful when he told the police he did not know anything about a body having been found at 1517 Cella Street.  He said that he and Ms. Pinson left some of their clothing, dishes, and a small television when they moved from 1517 Cella Street.  He said he called the Defendant and asked if he could come back to get the television but the Defendant told him not to come because the police said they did not want to find any trespassers in the house.  He said his mother wanted the television and kept asking him to retrieve it.  He asked the Defendant again, and the Defendant told him to come get it.  He thought this was in late March.  He said he met with the Defendant at the Defendant's house. Another person, whom he knew only as "Nephew," was there.  He said he and the Defendant went to 1517 Cella Street together.  He said that when they opened the door, he noticed a foul odor.  He said that they removed a large television the Defendant wanted from the front room and took it to the Defendant's house.  He said that when they returned to 1517 Cella Street, he used the bathroom and walked into his old room to retrieve some belongings.  He said that as he opened the door, he smelled a terrible odor.  He said he glimpsed at something that looked like it might be a woman's legs and had a bad feeling.  He said it "felt nasty" but was not sure what it was.  He said that the legs were bare but that the rest of the body was clothed.  He denied that there were any mattresses or pillows on top of the body.  He said the Defendant and Nephew walked up and told him "to bring [his] m------------- a-- here."  He said the Defendant had a gun in his hand.  He stated that the Defendant and Nephew took him back to the Defendant's house and that Nephew was behind the Defendant with the pistol.  He said the Defendant told him to keep his mouth shut and not to come there again or he might be killed.  He said the scene "wasn't that chaotic" when he was there.  He said that the Defendant began showing up in his neighborhood but that they did not talk.

Mr. Norvell testified that he cooperated with a 2006 police investigation into a non-fatal shooting and was shot in the foot and pistol-whipped three days after he talked to the police.  He said he was scared to cooperate with the police in the investigation of the victim's death.  Relative to this case, he said he was picked up by the police from his "partner" Roy's house on Cella Street and held in jail for about two days.  He said he was told he was under investigation but was not under arrest.  He said he was read his <u>Miranda</u> rights the first time he was picked up in May and the second time he was picked up and held in jail in July.  He said he gave a truthful statement the second time and explained to the police that he had not been truthful previously because of what happened to him in 2006.  He said his trial testimony was consistent with his second statement.

Mr. Norvell testified that he never returned to 1517 Cella Street to find the Defendant there with a girl.  He denied that he, Keevin, and "Benzo" went there and saw the Defendant.  He said he did not have anything to do with the victim's death.  He said he did not have any information about Keevin or Benzo having anything to do with the victim's death.

On cross-examination, Mr. Norvell testified that he and Ms. Pinson rented one room from Ed Ship but had use of the entire house. He denied that Mr. Ship ran a "crack house" and said that when he lived there, people did not come there to use drugs, although he agreed that he and Mr. Ship used drugs there. He said that he, Mr. Ship, and Ms. Pinson were the only residents but that Mr. Ship's girlfriend visited. He denied that Mr. Ship sold drugs at the house. He said that he and Ms. Pinson kept their room's door locked and that the house's exterior door was kept locked. He agreed that he and Ms. Pinson only stayed at 1517 Cella Street until she received her tax refund in January 2009. He agreed that they had time to pack their belongings when they left. He said, though, that neither of them had a car and that they had to carry their clothes to their new residence. He said they paid someone to move the large items, including a 56" television, a 32" television, and a king bedroom set. He agreed that he gave the keys to the Defendant when they finished moving their belongings. He stated that the Defendant sold drugs to Mr. Ship and that the three of them used drugs together.

Mr. Norvell testified that Mr. Ship told Mr. Norvell's mother she could have the small television in the back bedroom. He said he did not get the small television when he moved because he was using drugs and only thinking of himself. He said his mother persisted in asking him to get the television, even after the Defendant told him not to go to the house or he would go to jail. When his mother said she would call the police and ask them to go to the house with her to get the television, he talked to the Defendant again. He said this was when the Defendant told him to come to get the television. He did not know why the Defendant did not get the television himself. He did not know the date or time he went to get the television but saw the decomposing body. He estimated it was three weeks to one and one-half months after he moved. He said he was not supposed to be on the side of the house where the body was because the small television in Mr. Ship's bedroom was on the other side.

Mr. Norvell agreed that Mr. Ship left around Christmas 2008 and that no one knew his whereabouts. He said his mother came to the house to get money from him but said she did not go into Mr. Ship's bedroom. He said his mother asked for the television before Mr. Ship disappeared. He said there were televisions throughout the house. Mr. Norvell testified that he and Ms. Pinson previously lived in a duplex and that he gave most of his furnishings to the Defendant when they moved from the duplex.

Mr. Norvell testified that he told the police he had never seen Nephew before the day he went to 1517 Cella Street to get the television. He said he did not get a good look at Nephew because he was focused on Nephew's gun. He said Nephew appeared when the Defendant appeared with a gun. He said that after he was taken at gunpoint to the Defendant's house, the Defendant warned him not to say anything. He said he promised he

would not say anything. He said he described Nephew to the police only as a bald, black man and did not give any other details. He said he never told Ms. Pinson about the events when he returned to 1517 Cella Street because he did not want to put her in harm's way.

Mr. Norvell acknowledged that the first time he told the police about the body was in July 2009. He said he and Ms. Pinson were told the police were holding them because they were the last people to have been in the house where the murder occurred. He agreed he was in jail but did not think he was charged with a crime. He said he told the police that he was scared but would talk to them if they would assure his safety. He said that although he had been at the police department all day in May 2009, he was not held in jail then.

On redirect examination, Mr. Norvell acknowledged his signature on statements dated May 16, 2009, and July 6, 2009. Regarding the July 6 statement, he said that when the police asked who he thought was responsible for the victim's homicide, he identified the Defendant. He said he suspected the Defendant because the Defendant pulled a pistol on him and told him not to say anything or return to the area. He said he told the police that he knew the Defendant had gone into the house at 1517 Cella Street between the time he gave the Defendant the key and when he went to get the television because a lawnmower and a picture from the house were at the Defendant's house. He said he was willing to talk to the police once they reassured him the Defendant would not be "on the streets." On recross-examination, Mr. Norvell acknowledged that he did not call the Crime Stoppers hotline.

Tennessee Bureau of Investigation Special Agent Jessica Marcquez, an expert in DNA and serology, testified that she examined saliva standards from ten people, items and biological samples collected from the victim, and various items previously identified as physical evidence from 1517 Cella Street. The saliva samples were from the Defendant, Sidney Oplinger, Kevin Harris, Kevin Norvell, Brandon K. Bailey, Gregory Drinkwater, Debra Pinson, Floyd Jackson, Lawrence Miller, Sr., and Edward Ship. Because it was not typical to recover DNA from plastic, she did not perform testing on the condom wrapper or toothpaste tube from the scene. DNA testing of a substance from the floor of the scene revealed that it was from a female and contained markers at five of thirteen locations that were consistent with the victim's DNA profile. DNA from evidence collected from three walls at the scene was consistent with the victim's DNA profile. DNA from a beer can was insufficient or too degraded for analysis.

Agent Marcquez testified that she received an evidence package containing a pair of inside-out jeans with a shoe inside one of the legs. She said a cutting from the jeans' waistband contained a mixture of genetic material, with the victim being the major contributor and Mr. Norvell being a possible minor contributor. She eliminated the possibility that one of the other individuals whose samples she was provided was the minor

-15-

contributor. Two other cuttings from the waistband matched the victim's DNA profile. A blood sample from the jeans matched the victim's DNA at six of thirteen locations. A sample collected from the shoe was blood that matched the victim's DNA profile. She did not test evidence from a pillow because it did not contain a good sample. She tested cuttings of a stain and the sweatband of the hat Mr. Norvell previously identified as his. She said that the stain was blood and matched the victim's DNA and that the sweatband contained a mixture of genetic material belonging to the victim and another person. She could not exclude Mr. Norvell as the second contributor. She did not test a coat, underwear, a shoe, and a shower curtain because her information was that they were not associated with the victim's body. She said a cinder block contained the victim's DNA profile. She said that the victim's oral, vaginal, and anal swabs did not contain semen and that swabs of the victim's fingernails contained DNA but that it was insufficient or too degraded for DNA profiling. Her examination of the victim's shirt and bra did not reveal any semen.

Agent Marcquez testified that it was likely that the resident of a room would deposit DNA in the room. She said it was unlikely that a person who walked through a room once would deposit DNA in the room.

Agent Marcquez testified that she could determine from the clothing and the smell that the victim had been dead for a while. She said that DNA degraded from bacterial action of the decomposition process and that the failure to find semen or DNA did not mean it was not there.

On cross-examination, Agent Marcquez testified that she was able to exclude every male subject except Mr. Norvell as being a contributor of the genetic material she tested. She said she was unable to determine definitively if Mr. Norvell was the contributor of genetic material on the hat and the victim's jeans. She said she found no evidence of Ms. Pinson's DNA on any of the items she tested. On redirect examination, Agent Marcquez testified that the exclusion of possible contributors did not mean that they had not been present at the scene.

Dr. Marco Ross, an expert in forensic pathology, testified that on May 9, 2009, he performed an autopsy on the victim. He said that the victim had skull fractures but no other fractures. He said there were defects of the facial skin, which were most likely lacerations or tears from blunt force impact. Due to the level of decomposition, he was unable to make a definitive determination and said it was possible the defects were from insect activity. He noted, however, that the skin defects corresponded to the area of the skull fractures. Due to the decomposition, he was unable to determine whether the body contained bruising. He said the victim's death resulted from blunt force to the head. He said that the word "Mika" was tattooed on the back right hand and that what was possibly "Lil Annie" was tattooed on the

left thigh. The victim was identified through her dental records. He identified diagrams and photographs depicting fractures to the top and back of the victim's skull, the area around the right eye, the right forehead, and the bridge of the nose. He characterized the fractures as "serious." He said there was evidence of at least two blunt force impacts to the head and could not rule out more blows. When shown a piece of a cinder block previously identified as having been collected from the scene, he said it could have caused the type of injuries the victim had. He said the first impact to a body would not necessarily cause blood spatter.

Dr. Ross testified that there was alcohol present in the victim's body but said this was not unusual in decomposition of a body. He said there were no narcotics, cocaine, or cocaine metabolites in the victim's body. He said that it was possible the victim used a small amount of cocaine on the day of her death but that he expected a normal recreational amount would have been detected.

Memphis Police Sergeant Dexter Moses testified that he and Sergeant Murray interviewed the Defendant on July 5, 2009 about the victim's homicide. He did not recall how the Defendant came to the police department but said the Defendant was not handcuffed when he entered the interview room where the Defendant was. He said the interview room was locked during interviews. He said the Defendant denied that he was under the influence of alcohol or drugs. He said they advised the Defendant of his Miranda rights.

Sergeant Moses testified that the Defendant said the victim was a prostitute and drug user. He said the Defendant admitted providing cocaine to the victim. He said that although the Defendant claimed the victim was like a niece to him, he was skeptical because condom wrappers were found with the victim's body. He said that the victim was an attractive young woman and that the Defendant claimed he and the victim were close. He said the Defendant admitted he "set her up from time to time with different people" as a favor but did not consider himself a pimp. He said the Defendant stated that he used Trojan condoms in a gold pack, which was the type of condom wrapper found at 1517 Cella Street. He said the Defendant was visibly shaken when asked if the condoms at 1517 Cella Street were his. He said the Defendant admitted that he allowed the victim to perform oral sex on him in exchange for drugs. He said that due to the inconsistencies in the Defendant's statement, his supervisor obtained authority to place the Defendant on a forty-eight-hour hold in order to investigate more facts.

On cross-examination, Sergeant Moses testified that no written statement was taken on July 5, 2009. He said that if Sergeant Murray's supplement report referred to the Defendant as "Mr. Turner," it was a typographical error. He acknowledged that the supplement did not recount the Defendant's statement that he set up the victim with friends

but said he remembered the statement. He acknowledged the arrest ticket listing his name as the arresting officer and agreed that the Defendant was arrested for first degree murder.

Memphis Police Sergeant Anthony Mullins was recalled and testified that he and Lieutenant Davidson interviewed the Defendant on July 6, 2009. He said the Defendant was brought from the jail to a small interview room, where the Defendant was ankle-shackled to a metal bench that was bolted to the floor. He said the Defendant's hands and one ankle were not shackled. He said there was not a lock on the interview room's door. He said the Defendant was advised of his rights. He identified a written statement signed by the Defendant.

The Defendant's statement to Sergeant Mullins was read into evidence. In it, the Defendant said he was not responsible for the victim's death, nor was he present when she was killed. He said that Keevin and Benzo were responsible and that Benzo threatened his life in late February or early March if he did not stay away from 1517 Cella Street. He said the first threat was after he saw Keevin's car at 1517 Cella Street. He said he received drugs in exchange for staying away. He said that Benzo's threats were at Keevin's direction and that they continued after the Missing Persons Bureau became involved. He said he continued to contact the police in order to put pressure on Keevin and to ensure his family's and his safety. He said Benzo hit him in the face and killed his puppy with a bat to let him know they were serious. He said he was beaten in a church parking lot and told they would hide him under the bed the same as the victim. He said that as the weather changed, he was instructed to ignore the flies and odor at 1517 Cella Street. The Defendant said that the victim was last seen alive at Keevin's house three or four days after the Super Bowl and was there against her will. He said the victim had a black eye and was crying with fear. The Defendant reported that "Katrina," "Skittles," "Aunt Chris," and "Brown Eyes" could corroborate the last sighting of the victim. He said he was at 1517 Cella Street one time after the victim was last seen, when he was asked to step inside in order to receive drugs and money as payment for his silence. The Defendant said that to the best of his knowledge, the reasons Keevin or Benzo would want to kill the victim were that she stole cocaine, jewelry, and other items and that she was a threat to Keevin because the father of her child was a member of a rival gang to Keevin's gang. He identified the father of the victim's child as Brandon Bailey and said he was a governor of the Gangster Disciples gang. He said Keevin was a "major" governor of the Crips gang.

The Defendant said in his statement to Sergeant Mullins that he had sexual relations with the victim. He said Keevin had sexual relations with the victim and sometimes made her walk around nude. He said Benzo often bragged about having oral sex with the victim. He was unsure whether Kevin was sexually intimate with the victim but said he knew Kevin was trying to pursue her. He said Kevin was a former resident of 1517 Cella Street and was

a "door man or worker" for Keevin. He denied that he had worked as Keevin's door man but said he ran errands for Keevin when Benzo was unavailable. He said Keevin severed ties with him after the victim's disappearance and became aggressive toward him. He said he never had a key to 1517 Cella Street, even during a time when he rented a room there. When asked if he tried to keep people away from 1517 Cella Street, he said that he tried to "keep them at bay" for their safety and that of his family but that he did not understand "the full extent of [the victim's] whereabouts."

Sergeant Mullins testified that the Defendant said the victim was wearing a heavy purple jacket, jeans, and Nike tennis shoes with a pink logo when he last saw her and said this description matched the clothing at the scene. He said that the police were able to find Aunt Chris with information provided by the Defendant, that she directed them to Skittles, and that the information Skittles provided was inconsistent with the Defendant's statement. He said they could not find Brown Eyes that night and did not know if she was located later.

Sergeant Mullins testified that Mr. Norvell was calm and cooperative when he interviewed him on May 16, 2009. He said that when he interviewed Mr. Norvell on July 5 and advised him that there was DNA evidence linking him to the scene and possibly to the homicide, Mr. Norvell became upset and cried and yelled. He said Mr. Norvell was reluctant but eventually gave them information that inculpated the Defendant. He said Mr. Norvell was afraid of retaliation. He said that Mr. Norvell knew the Defendant was at the police department when Mr. Norvell gave the statement implicating the Defendant.

On cross-examination, Sergeant Mullins testified that Mr. Norvell was calm and denied any knowledge relevant to the case when he interviewed Mr. Norvell in May 2009. He said Mr. Norvell did not say anything about threats from the Defendant or Ms. Pinson or about the Defendant's riding his bicycle past Mr. Norvell's home. He said DNA evidence was collected from Mr. Norvell in May 2009. He said that in July 2009 when he told Mr. Norvell that his DNA was found at the scene and he might be charged with first degree murder, Mr. Norvell became upset. He said that Mr. Norvell initially said some things that were not consistent with the scene, then said he did not know anything. He said that Mr. Norvell tried to give false information about the crime by predicting what the police wanted to hear but that Mr. Norvell was not successful. He said the false information involved how Mr. Norvell accidentally discovered the body and the body's location, which he said was inconsistent with the scene. Eventually, Mr. Norvell became upset and cried. Sergeant Mullins said that Mr. Norvell became more believable, admitted he was scared, and implicated the Defendant.

Sergeant Mullins testified that he spoke with the Defendant, who was in custody pursuant to a forty-eight-hour hold, the following day. He recalled Gregory Drinkwater's

name being mentioned early in the investigation but did not recall if the Defendant was the person who mentioned Mr. Drinkwater. He thought the Defendant identified Mr. Drinkwater as being present for the Super Bowl party. He agreed that the Defendant said the victim was present at the party. He thought the Defendant said the victim left with someone and returned, but then he did not see where she went. He said the Defendant seemed concerned, not scared. He said the Defendant was not free to leave. He said he did not have to yell in order to calm the Defendant but said he may have been loud at some point.

On redirect examination, Sergeant Mullins testified that Mr. Norvell claimed to have given the keys to 1517 Cella Street to the Defendant after moving out. He said Mr. Norvell corroborated Mr. Norvell's claim about the Defendant being in and out of 1517 Cella Street by telling him about the lawnmower and the picture frame that ended up at the Defendant's house. He said that in order for Mr. Norvell to see the victim as Mr. Norvell described her, the mattress would not have been on top of her body. He said that with respect to the bottom half of the victim's body, only her foot was visible when he visited the crime scene. He said that to his knowledge, no one except the Defendant gave an accurate description of the victim's clothing at the time of her disappearance. He said there was no chance he revealed any information during his questioning that would otherwise be known only to the person who killed the victim. He said he believed Mr. Norvell's fear of the Defendant was genuine. Sergeant Mullins said Mr. Norvell's initial reaction of yelling and protesting his innocence and later becoming calm as he provided accurate information was consistent with Sergeant Mullins's experience with other individuals who were questioned about crimes.

Sergeant Mullins testified that he did not think the Defendant's injecting himself into the investigation was a sincere effort to assist the police. He said the Defendant's expressions of fear of Keevin and Benzo did not seem genuine. He noted reports that the Defendant flagged down the first officers at the scene and said this was not consistent with the Defendant's claim he was afraid for his safety. He said the Defendant's statement did not use the same language that the Defendant used in conversation, and he thought this was an attempt to be more believable.

On recross-examination, Sergeant Mullins testified that he did not attempt to recover the lawnmower from the Defendant's house. He did not attempt to corroborate Mr. Norvell's report that a picture from 1517 Cella Street was hanging in the Defendant's home. He conceded Mr. Norvell could have lied about the lawnmower and picture. On redirect examination, Sergeant Mullins identified a photograph exhibit of 1517 Cella Street. He noted that the grass was shorter on the side of the house where the body was found. He said this was the side nearer to the Defendant's home. He said neighbors commented that the Defendant mowed the grass on only one side of 1517 Cella Street. He did not recall finding a lawnmower at 1517 Cella Street. He said that part of the Defendant's lawn was cut shorter

than the mown grass on one side at 1517 Cella Street, that part of the Defendant's lawn was worn down by vehicle or foot traffic, and that it was overgrown in the back.

Memphis Police Lieutenant Shirley Ann Woods testified that she and Lieutenant Rick Davidson interviewed the Defendant on July 7, 2009. She said that they took a written statement from the Defendant and that Sergeant Parks participated in taking the written statement. She said the Defendant stated that the victim was like a niece to him. She said the Defendant claimed that the victim was in trouble with Keevin because she stole drugs and jewelry. She said the Defendant told her that Benzo killed the victim. She said the Defendant stated that he saw Keevin and Benzo at a house next door to the Defendant's house. She said the Defendant claimed that he looked through a bedroom window and saw the victim's body underneath a mattress, that Keevin and Benzo came outside and told him to "keep his mouth shut," and that they gave him drugs and cash to stay away and keep others away. She said the Defendant made statements that "he wanted to do right and he wanted to do right by God."

Lieutenant Woods testified that the Defendant was allowed a restroom break in the interview and that when he returned to the interview room, he began writing on a blackboard. She said she thought the Defendant tried to give the police hints with his writings. She identified photographs of the writings, which included "R.I.P. Lamika Turner," "Fear is not facing your actions," "Overcome accidental fears," "God knows all," "Face every action responsibly," "Face your responsiblity," and "Life is what you make it so make it fear free. God is the way." She said that when she and Lieutenant Davidson returned to the interview room, the Defendant said he wanted to tell the truth. She said the Defendant stated that he and the victim were at 1517 Cella Street about to have consensual sex when he heard a noise outside. The Defendant said the victim had been undressing and he had been applying a condom to himself. The Defendant said that he told the victim to dress and that he picked up a cinder block. The Defendant said Benzo came through the door aggressively. She said the Defendant claimed he raised the cinder block in the air and hit the victim, who was standing behind him, on top of the head and caused her to fall. She said that the Defendant stated that Benzo continued coming toward him aggressively and that the Defendant fell on top of the victim, hitting the back of her head with the cinder block. Lieutenant Woods said the Defendant claimed he and Benzo struggled and that he was able to free himself and flee the house, leaving the victim behind. She said the Defendant stated that he heard the victim screaming and that Benzo had a metal rod or stick he used to strike the victim. She said the Defendant stated that he locked himself inside his house, removed a Magnum condom and disposed of it in the toilet, retrieved a pellet gun because he was afraid of Benzo, and waited for Benzo to arrive at his house. Lieutenant Woods testified that the Defendant admitted returning to 1517 Cella Street but that she did not know when he claimed to have done so.

She said the Defendant claimed he heard Keevin and Benzo at 1517 Cella Street, looked in the window, and saw them and the victim's body underneath a mattress.

Lieutenant Woods testified that at this point, the decision was made to obtain a written statement from the Defendant. She said that Sergeant Parker questioned the Defendant and typed the statement while she and Lieutenant Davidson observed.

On cross-examination, Lieutenant Woods testified that the Defendant repeatedly denied killing the victim. She said this was before he began writing on the blackboard. She said the Defendant's statement about the home invasion could be true but that she believed some facts were omitted.

On redirect examination, Lieutenant Woods testified that she did not believe the Defendant's denial of any involvement in the victim's homicide. She said she believed the Defendant was "writing out his conscious [sic]" on the blackboard. She said that she did not think the Defendant told her the truth after he returned from the restroom but that she believed he was truthful about hitting the victim's head with a cinder block.

Memphis Police Sergeant David Parks testified that the victim's body was found on May 8, 2009. He said that his initial involvement was in taking statements at the police department and that he did not go to the scene until May 9. He said he interviewed the Defendant and the Defendant's live-in girlfriend, Cindy Oplinger. He said Ms. Oplinger was known as Sunshine. He said the officers at the scene were suspicious of the Defendant because he claimed to have contacted the police, although Kayla Smith was the person who contacted them. He said the Defendant also knew what the victim was wearing.

Sergeant Parks testified that the Defendant gave statements at the scene and at the police department on May 8, July 5, July 6, and July 7, 2009. He identified the written statement he obtained from the Defendant on May 8. He said that when he took the May 8 statement, the Defendant was a witness, not a suspect. He said that the victim's body had not been identified, although they had some idea about the identity. He said that the statement was typed by a transcriptionist as the Defendant sat in the interview room and that the Defendant was allowed to review the statement.

Sergeant Parks testified that the Defendant's statement contained the following information. The Defendant denied responsibility for the death of the person whose body was found at 1517 Cella Street. The Defendant said a neighbor, Ms. Leann, who lived at 1519 Cella Street, called the police about the odor. The Defendant stated that Ms. Leann and another neighbor, Mr. Melvin, went inside the house two days earlier. The Defendant said Melvin, "the neighborhood lawn man," stated that the odor had existed for one month. The

Defendant stated that Melvin thought there was a dead animal in the house but that Melvin did not go through the entire house. The Defendant said "Eddie" had lived at 1517 Cella Street but was forced to move by gang members. The Defendant said that "Kelvin" and "Debra" lived at 1517 Cella Street for one month after Eddie left and that they left "the beginning of mid March." The Defendant claimed he first noticed the odor and flies about one week earlier. The Defendant claimed he did not investigate because the odor could have been from an animal and it was not his business. The Defendant said the body might be Lamika Turner. The Defendant said that the victim was last seen at his Super Bowl party at 1515 Cella Street and that she wore white and pink Nike shoes, blue jeans with studs, a purplish-blue top, and a black and burgundy jacket. The Defendant said the party was also attended by Mr. Melvin, Mr. Woods, Cindy Oplinger, and Lawrence Numb. The Defendant said that during the party, the victim received threatening text messages from Keevin, who was her powder cocaine supplier. He said the text messages included threats that Keevin would "f--- [the victim] off" if she did not perform oral sex on him, that he knew her child's father was a "GD," and that he was "the governor of the crypts [sic]." The Defendant said that despite the victim's fear, she went outside during halftime and bought cocaine from Keevin. The Defendant said that immediately thereafter, the victim received a telephone call from her child's father. The Defendant professed not to know the substance of the conversation but said it "was not a happy conversation." The Defendant stated that he knew the victim's boyfriend, Brandon Bailey, sometimes retaliated when the victim hit Mr. Bailey by becoming "extrememly violent," fighting her physically, and taking away her daughter. The Defendant said that Mr. Bailey fought the victim "as if she were a man and not a woman" using his hands, brooms, or other objects. The Defendant stated that he last saw the victim when he escorted her out his door and saw "Lil Keevin" grab the victim's hand and push her into his brown, four-door Oldsmobile. The Defendant claimed this was the last time he saw the victim alive. The Defendant said that Mr. Bailey looked for the victim and Lil Keevin two hours after the game ended. The Defendant said that Gregory Drinkwater told Mr. Bailey that the victim and Lil Keevin left together and that Mr. Bailey told the Defendant not to lie for the victim or he would "do" him. The Defendant stated that Mr. Drinkwater claimed to have seen the victim at Keevin's house and that Mr. Drinkwater said the victim was scared and not allowed to leave but was okay. The Defendant said that people told him the victim was still at Keevin's house three or four days later. He said a "battle" erupted "between the GD's and the crypts [sic] . . . Bay Street against Cella Street." The Defendant stated that Keevin's night shift door person, whom he identified as "Ms. Chris," Angela Benson, and Mr. Drinkwater saw the victim being held against her will at Keevin's house. The Defendant said Keevin was a "drug lord," organized burglaries, broke into cars, and was the governor of the "crypts." The Defendant said Keevin was physically violent toward women, including the victim.

Sergeant Parks testified that the police interviewed Cindy Oplinger, Kevin Norvell, Brandon Bailey, Floyd Jackson, Debra Pinson, Lawrence Miller, Gregory Whitmore, Tony O'Conner, Latemar "Tae Tae" Turner, Melvin Parks, Ashley Thomas, and Kayla Smith. He said saliva samples were collected from several individuals. He said that evidence was collected from the scene and from the victim's body. He said Edward Ship was the owner of the residence at 1517 Cella Street. He said that the residence had been converted to a boarding house, that it was in the foreclosure process, and that Mr. Ship left.

Sergeant Parks testified that the victim's telephone records reflected that the last person with whom she spoke for more than a minute was Antonio Hunter, around midnight on February 2, 2009. He said that a call involving voice mail lasted about a minute. He said the records also reflected calls with Gregory Whitmore. He said the records reflected that after the final call with Mr. Hunter, there were several incoming calls lasting less than a minute. He said that Mr. Hunter and Mr. Whitmore were interviewed and that although both stated they had seen the victim within the last week she was known to be alive, neither saw her on February 2. He stated that Mr. Drinkwater said that the victim was in front of the Defendant's house getting out of Keevin's car and into a green SUV on February 2 but that the Defendant identified the date the victim was last at his house as February 1 and said she got into Keevin's car. He said the telephone records corroborated Mr. Drinkwater's statement.

Sergeant Parks testified that the Defendant identified Melvin Parks as an alibi witness who had been at his house for the Super Bowl party. Sergeant Parks said, however, that Mr. Parks was an older drug user who probably had mental health issues. He said Mr. Parks denied that he went to Super Bowl parties. He said that Kayla Smith stated that about three weeks earlier, the Defendant told her he smelled something. He said Kevin Harris, also known as "Keevin" and "Lil Keevin," stated that there were rumors in the neighborhood that the Defendant killed the victim. Sergeant Parks said that Floyd "Butch" Jackson confirmed that the victim associated with the Defendant and that he last saw her about 6:00 a.m. on February 1, when he took her to the Defendant's house. He said that Latemar Turner stated that she last talked to the victim around 7:00 to 9:00 p.m. on February 2, when the victim said she was at the Defendant's house. He said Ashley Thomas, a jail inmate, claimed to have unspecified information about rumors from the neighborhood. He said Debra Pinson stated that she and her boyfriend, Kevin Norvell, left 1517 Cella Street about January 15. Ms. Pinson stated that Mr. Norvell spent time "over there" for about two weeks and then stopped around the time the victim disappeared. He said that Mr. Norvell stated that he thought he saw the victim's body when he returned to retrieve some of his belongings. Sergeant Parks said that Mr. Norvell stated that the Defendant would not allow him to enter the house at first but eventually allowed him inside certain rooms. Sergeant Parks said that neither Lawrence

Miller, Edward Ship, Gregory Whitmore, nor Antonio Hunter had information about the homicide. He said the only information Ricky Hamilton had involved neighborhood rumors.

Sergeant Parks testified that he took a written statement from the Defendant on July 7, 2009, in which the Defendant stated: There was a struggle in the house where he and the victim were after two men kicked open the door. Kevin directed Keevin and Benzo into the house. The Defendant picked up a "masonry brick," which he said was a gray cinder block with two hollow squares, for protection but accidentally struck the top of the victim's head. The victim collapsed to the floor and screamed. The two men attacked him, and he struggled but broke free. The men were there to attack the victim and were trying to recover the cocaine and jewelry she allegedly took. They inflicted several blows on him and the victim. Benzo struck the victim's forehead with a metal baton several times. He heard the victim pleading for her life and fled the house. The Defendant said he struck the victim twice with the brick, once on top of her head and a second time when he fell on top of her. He said Keevin was the governor of the "Crypts" gang, sold drugs, and was the "neighborhood boot legger." He did not know Benzo's given name but identified him as Keevin's "body guard enforcer." He said Benzo lived with Keevin and always carried a metal baton. The Defendant stated that when the intruders entered, the victim was nude from the waist down. He said his pants were unzipped and he wore a condom, the wrapper of which he had discarded on the floor. He said he initially tried to block the bedroom door with the brick. The Defendant ran home but did not call the police.

Sergeant Parks testified that the Defendant claimed to have returned to 1517 Cella a few days later and saw Benzo and Kevin covering the victim's body with a mattress. He said they gave him cocaine, marijuana, and $50 to keep others out of the house and "forget" what he knew. He said he went inside 1517 Cella Street after Benzo and Kevin left and saw the victim's body but did nothing because he was afraid. He said he was asked to come back to 1517 Cella Street a few days later to receive another "package." Four weeks later, he heard the victim had been seen and returned to the house and saw her decomposing body. He said he was afraid and ashamed and did nothing, but two days later he contacted the Missing Persons' Bureau through Brandon Bailey. The Defendant said that he was sorry he left the victim to suffer but that he was afraid.

Sergeant Parks testified that when he went to the scene on May 9, 2009, there were several cinder blocks in the bedroom that had been used as a foundation to support the bed. He said he believed the Defendant's admissions of striking the victim but thought it did not happen exactly as the Defendant described.

On cross-examination, Sergeant Parks testified that written statements were not taken from all witnesses. He agreed that no statement was taken from Gregory Drinkwater, despite

Mr. Drinkwater's claim to have seen the victim leaving the Defendant's house with someone other than the Defendant. He noted that Mr. Drinkwater said this happened the Monday after the Super Bowl. He agreed he did not have a supplement report regarding any cell phone calls between the victim and the Defendant. He acknowledged that the Defendant's July 7, 2009 statement did not specify the date and time the victim was killed. He said that although he did not go to the scene until the day after the body was discovered, he was aware from other officers that a piece of cinder block covered in blood was found at the scene. He did not recall whether other pieces were recovered. He said the Defendant mentioned blows to the victim's head and ribs but did not state which side of her face was injured. He identified a document which noted that the Defendant had been detained pursuant to a forty-eight-hour hold for first degree murder, in accord with the department's practice in homicide cases, and that the charge was amended to second degree murder after the Defendant gave his statement and the police consulted the district attorney's office.

On redirect examination, Sergeant Parks testified that photograph exhibits from the scene depicted pieces of broken cinder block near the victim's head. He said the exhibits also depicted brown-reddish fluid that might be blood. He said Detective Mullins decided which items should be collected as evidence. He denied that he offered to speak to the prosecutor on the Defendant's behalf if the Defendant confessed.

Gregory Drinkwater testified for the defense that he had criminal convictions for theft, evading arrest, and criminal impersonation. He said that in February 2009, he lived with his parents in the Bethel Grove area of the Orange Mound neighborhood. He said the Defendant, whom he had known since junior high school, also lived in Orange Mound on Cella Circle. He said that he and the Defendant were friends and that they smoked crack cocaine together in February 2009. He said that in late February, he and Cindy Oplinger had a disagreement when he was at the house the Defendant and Ms. Oplinger shared. He said they called each other names but did not hit each other. He said the Defendant intervened in the argument. He said that as he left the home after the argument, the Defendant shot at his Honda Accord with a pellet gun. He said that the police were called but that he did not press charges.

Mr. Drinkwater testified that earlier in February, he went to the Defendant's house around 2:00 p.m. He said the Defendant was preparing for the Super Bowl later that day. He said that he stayed about an hour, that he told the Defendant he would return, but that he did not. He said Ms. Oplinger and "a couple of people from down the street" were at the Defendant's house. He said he returned to the Defendant's house about 8:00 or 9:00 a.m. the next day in order to smoke crack cocaine there. He said that he woke the Defendant and that they used drugs for "days on end." He said "Lashika" and a male friend arrived around nightfall. He said that he had seen Lashika at the Defendant's house previously but that he

-26-

did not know her.  When shown a photograph of the victim, he identified her as the woman who came to the Defendant's house.  He did not know the man who came with the victim, nor had he ever seen him.  He said the man was taller than he, was African-American with dark skin, and drove a green Ford Explorer.  He said the victim was happy and talkative and showed everyone her manicure.  He said the victim did not use drugs with him, the Defendant, and Ms. Oplinger.  He said the victim stated that she came to the Defendant's house to hide from her child's father, whom she identified as Brandon.  He said that although he was under the influence of drugs, he was sure of his identification of the victim.  He said that he had seen the victim about twenty times previously and that he had been to the house where she lived with Brandon.  He said he did not know her name and had not talked to her, though, because she was "the dope man's girlfriend" and talking to her was "taboo."  He thought the victim and the man left the house and returned and said they stayed at the Defendant's house for about an hour.  He said she left a second time with the man.  He said the Defendant was inside at this point.  He said that later that night, he and the Defendant were returning from the store and saw the victim return in another car, get out of the car, and enter the green Explorer.  He stated that the Defendant went inside and that he left around 10:30 or 11:00 p.m.  He said this was the last time he saw the victim.  He said that the police took a written statement from him in May 2009 and that he did not want to be in court.

On cross-examination, Mr. Drinkwater testified that in addition to the convictions he acknowledged on direct examination, he had a theft conviction, a reckless endangerment with a deadly weapon conviction, and a felony conviction for weapons possession.  He acknowledged that when the Defendant inserted himself into the argument between Mr. Drinkwater and Ms. Oplinger, the fight became physical.  He said he and the Defendant spent time together when he started using drugs regularly in 2007.  He denied that he and the Defendant sold drugs to each other.  He said he did not know who was in the car in which the victim left and thought she was a prostitute and the person was a customer.  He acknowledged telling Sergeant Murray that the Defendant said he gave the victim drugs and had sex with her.  He said, however, that the Defendant said he had sex with the victim.  He said that he was unaware of the victim's using crack cocaine and that to the best of his knowledge, if she prostituted herself, it was for cash.  He thought the victim bought powder cocaine when she was in the other car.  He said that the Defendant stated the victim used powder cocaine but that Mr. Drinkwater never saw it.  He said that he recognized the car, which had tinted windows that kept him from seeing inside, and that its owner sold powder cocaine.  He estimated that the man in the green Explorer weighed at least 200 to 210 pounds.

Mr. Drinkwater said the Defendant never said he "bashed" the victim's head with a cinder block.  He said that as the events of this case were taking place, he was trying to stop using drugs.  He was sure he did not see the victim again after she left with the man in the

-27-

green Explorer. He acknowledged that he told Sergeant Murray he did not see the driver. He said that his memory had been clouded but that it had come back to him in the last week. He acknowledged he did not tell Officer Murray about the victim "coming in with another guy."

**I**

The Defendant contends that the evidence is not sufficient to support his conviction. He argues that the evidence points to Kevin Norvell, not him, as the victim's killer. The State contends that the evidence is sufficient to support the second degree murder conviction. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S .W.2d 651, 659 (Tenn. 1997).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998)). Circumstantial evidence alone may be sufficient to support a conviction. State v. Richmond, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

As relevant to the Defendant's case, second degree murder is an unlawful, knowing killing. T.C.A. §§ 39-13-201, 39-13-210(a)(1) (2010). A person acts knowingly with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result. Id. § 39-11-106(a)(20) (2006) (amended 2009, 2011).

In the light most favorable to the State, the evidence reflects that after initially denying any involvement, the Defendant admitted striking the victim twice with a cinder block, although he claimed it was accidental, at the location where the victim's decomposing body

was discovered. The crime took place in an abandoned house next door to the house the Defendant shared with his girlfriend. According to the Defendant, he and the victim were about to have sex at the abandoned house when Benzo, Kevin Harris, and Kevin Norvell invaded the house. Mr. Harris testified, however, that he last saw the victim when she left his home with Floyd Jackson after his Super Bowl party. Mr. Jackson testified that he took the victim to the Defendant's house. Mr. Harris testified that when Mr. Jackson returned to his house, Mr. Jackson stated that he had taken the victim to the Defendant's house. The victim's cause of death was blunt force trauma to the head, and her blood was on a piece of cinder block. Mr. Norvell testified that the Defendant refused to allow him to enter the house at 1517 Cella Street to retrieve personal belongings. When the Defendant eventually relented, Mr. Norvell saw the victim's body, and the Defendant threatened Mr. Norvell with a gun and told him to stay away and remain quiet.

The Defendant's contention that the evidence points to Kevin Norvell as the perpetrator overlooks Mr. Norvell's testimony that he did not commit the crime and that he did not report the Defendant's threats because he was afraid. The jury assessed Mr. Norvell's credibility in reaching its verdict, and we may not revisit its evaluation. The DNA evidence from the scene and the victim's jeans was explained as DNA transfer from Mr. Norvell having lived in the room where the victim was killed.

The evidence is sufficient to support the second degree murder conviction. The Defendant is not entitled to relief.

## II

The Defendant contends that the trial court erred in admitting Kevin Harris's testimony about rumors regarding the victim's disappearance. Mr. Harris testified that he heard rumors that the Defendant made statements that Mr. Harris was the last person with the victim and that Mr. Harris assaulted the Defendant because of the rumors. The Defendant argues that the evidence was inadmissible hearsay. The State contends that the evidence was properly admitted to prove Mr. Harris's state of mind, not the truth of the matter asserted. Alternatively, the State argues that admission of Mr. Harris's testimony was harmless error because there was other evidence that the Defendant told others that Mr. Harris was the perpetrator. We conclude that the trial court did not err in admitting the evidence.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay evidence is not admissible except as provided by certain exceptions in the Rules of Evidence. Tenn. R. Evid. 802.

Mr. Harris testified that his neighbors told him that the police had been coming to his house but that he always missed them. He said he decided to talk to the police because he was tired of their harassing him for something he did not do. He said that the victim's sister told him the victim was missing and that he assumed the police wanted to talk to him about the victim's whereabouts. He was asked whether he heard "stuff on the streets" about the victim's disappearance, and the defense objected on the basis that the question elicited hearsay evidence. The trial court ruled:

> [Defense counsel], if the question goes to, I don't know if it goes to the state of mind. It would not be hearsay, and Mr. Harris has told the jury that he didn't want to talk to the police because every time they came around they were harassing him about things that he didn't do. So I don't know if this goes to his state of mind or not.
>
> [Prosecutor], you may proceed.

Mr. Harris then testified:

> Q      Did you start hearing stuff on the street?
>
> A      Yeah.
>
> Q      What were you hearing?
>
> A      That he was going around lying on me and telling folks that I, I was the last one, she was the last one with me.
>
> Q      So people were telling you, who was saying that about you?
>
> A      Hot Rod was telling folks that she was the last one with me and stuff.
>
> Q      Did you hear that once or more than once?
>
> A      More than once.

Q      And was this over a period of time that you were hearing this?

A      Uh-huh.

Q      So word on the street was, Hot Rod is saying the last person that she was seen alive with was you?

A      Yeah.

Q      That's not true. Right?

A      No.

Q      Did there come a time when you ran into the defendant after [the victim] went missing?

A      Yeah. He was, he was riding his bike down my street and I was driving my car and I was so mad. I got tired of him constantly, you know what I'm saying, lying on me. I jumped out of my car, put it in park, jumped out of my car and I was like, "Man, what are you doing constantly lying on me, man?" "Man, I ain't told nobody nothing." I said, "These folks ain't lying on you. So I fired on him.

Q      You popped him?

A      Yeah. Knocked him off the bike.

Mr. Harris testified that the Defendant rode away on his bike and told him to stay there until the Defendant returned. Mr. Harris thought the Defendant was going to get a pistol and waited two or three hours, but the Defendant never returned. Mr. Harris then testified:

Q      Did there come a time when you spoke with police officers in connection with this homicide investigation?

A      Uh-huh.

Q      That was on May 10th?

-31-

A    Yeah.

Q    Was that close to the time when you saw him on his bike and punched him and he fled on his bicycle?

A    Yeah.

Q    Do you know when?

A    I don't know what month.

Q    Next day? A couple of days later?

A    About a week later. I think about a week later. I went down there and talked to the police.

Q    When you went down to talk to the police, you had already been hearing from people on the street that he was putting your name in this. Right?

A    Uh-huh.

. . .

Q    So you voluntarily came down [to the police department]?

A    Uh-huh.

Q    The cops didn't have to come pick you up?

A    No.

Q    Why is it that you want to cooperate with the police and give a statement?

A    To clear my name because he was constantly lying on me. Had a lot of females scared to holler at me, hook up with me.

Q    Because he was saying that killing [sic] this girl. Right?

-32-

A        Yeah.  Then a lot of girls around the hood, other folks was telling them, "Man, you riding with a murderer, man."  This and that.  You know what I'm saying?  I was like, "Man, ya'll believe what you want to believe.  You know what I'm saying?  I ain't with that, man.  You know what I'm saying?  You believe them folks if you want."  I was telling different females, "You can believe them if you want.  You know what I'm saying?  But I ain't with that."

. . .

Q        So how did it make you feel that he's putting the word out on the street that you murdered a girl?

A        I was mad.  I ain't even going to lie.  I was mad.  I was hot.  I know I ain't did nothing.  You know what I'm saying?  He lying on me.  I was mad.  I told the police, "If he put my name out there again, I'll fire on him again."  I was mad.

Q        So you were mad at him because he's accusing you [of] something you didn't do, right?

A        Yeah.


There are two levels of out-of-court statements involved: (1) the Defendant's purported statements that the victim was last seen with Mr. Harris and (2) unknown persons' statements to Mr. Harris that the Defendant made the purported statements.  The State did not seek to offer these statements for the truth of the matter asserted--that the victim was last seen with Mr. Harris.  Rather, the State offered the evidence to show Mr. Harris's motivation for talking to the police--in order to clear suspicion that he was involved in the victim's disappearance.  Because the evidence was not offered to prove the truth of the matter asserted, the hearsay rule did not prohibit its admission.  The Defendant is not entitled to relief on this basis.

**III**


The Defendant contends that the trial court erred in excluding evidence of a previous altercation in which Kevin Norvell allegedly threw a brick at Mr. Norvell's stepfather.  He argues that despite the trial court's ruling that the evidence was not admissible, he had a

constitutional right to present the evidence because its exclusion prevented him from presenting a defense. See Chambers v. Mississippi, 410 U.S. 284, 302 (1973). The State counters that the trial court acted within its discretion in excluding the evidence pursuant to Tennessee Rule of Evidence 609. We conclude that the Defendant is not entitled to relief.

The trial court conducted a hearing outside the presence of the jury regarding the defense's intent to cross-examine Mr. Norvell about the alleged brick-throwing incident. Mr. Norvell testified that on May 4, 2006, he had an altercation with his stepfather, Stevie Jones. He said that Mr. Jones called his mother profane names and that he hit Mr. Jones with his hand a couple of times. He said that his cousin intervened, that his cousin took him across the street, and that Mr. Jones was gone when he returned. He denied striking Mr. Jones with an object. He acknowledged that Mr. Jones's jaw and nose were fractured and that he had a misdemeanor assault conviction from the incident.

In its ruling, the trial court noted its consideration of Rules 401, 402, 403, 404, 607, 608, and 609, as well as the Defendant's due process right to present a defense and call favorable witnesses. The court found that the presence of Mr. Norvell's DNA at the scene could be explained by his having lived at the house. The court found that Mr. Norvell was convicted of misdemeanor assault relative to the incident with Mr. Jones. The court found that Mr. Norvell struck Mr. Jones with his hand and that there was no proof Mr. Norvell struck Mr. Jones with a brick, stone, or other weapon. The court found that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice and that the evidence would not assist the jury in determining whether the Defendant was guilty of the charged crime. The court excluded the evidence.

The Defendant does not argue that the trial court erred in excluding the evidence based upon the Rules of Evidence. We agree with the trial court that the evidence was not relevant. See Tenn. R. Evid. 401. We note that the evidence of the altercation did not address Mr. Norvell's character for truthfulness or untruthfulness, nor did the crime of which he was convicted involve dishonestly or a false statement. See Tenn. R. Evid. 608, 609. The Defendant's argument is limited to his constitutional right to present a defense and favorable witnesses.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). In that vein, "The Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense." State v. Brown, 29 S.W.3d 427, 432 (Tenn.

2000); see <u>Chambers</u>, 410 U.S. at 302 ("Few rights are more fundamental than that of an accused to present witnesses in his own defense.").

In appropriate cases, this right surpasses the hearsay rules. See <u>Brown</u>, 29 S.W.3d at 433 (relying on <u>Chambers</u>). However, in many other situations, the defendant's due process right "must yield to other legitimate interests in the criminal trial process," including "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." <u>Brown</u>, 29 S.W.3d at 432 (quoting <u>Chambers</u>, 410 U.S. at 295, 302). Our state supreme court stated in <u>Brown</u>:

> The facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence. Generally, the analysis should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important. See <u>Chambers</u>, 410 U.S. at 298-301, 93 S. Ct. at 1047-49.

<u>Id.</u> at 433-34.

Turning to the present case, we cannot say that the Defendant's due process rights were violated by the court's limiting cross-examination of Mr. Norvell about hitting Mr. Jones with his hand. In the jury-out hearing, Mr. Norvell denied he hit Mr. Jones with a brick or another object. The Defendant has not established that this evidence was relevant and reliable and is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE

-35-